UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

No 06-CV-1200 (JFB) (MLO)
_____

TAREKE ADAM,

Plaintiff,

VERSUS

GLEN COVE SCHOOL,

Defendant.

_____

MEMORANDUM AND ORDER
February 21 2008
_____

JOSEPH F. BIANCO, District Judge:

*Pro Se* plaintiff, Tareke Adam (hereinafter, "Adam" or "plaintiff"), brought the instant case, alleging employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. Specifically, plaintiff alleges that Glen Cove School District (hereinafter, "Glen Cove" or "defendant") discriminated against him based on his race in its decision to terminate his employment as a "Cleaner" at the Glen Cove High School. Plaintiff was employed as a full-time cleaner from May 2002 until his termination in December 2004.

Defendant moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, there is insufficient evidence from which a reasonable jury could find that defendant's termination was the result of his race, rather than the articulated reason of insubordination. Accordingly, the Court grants defendant's motion for summary judgment in its entirety.

I. BACKGROUND

A. The Facts

The facts described below are taken from the parties' depositions, affidavits, exhibits and defendant's Local Rule 56.1 statement of facts.[1] Upon consideration of a motion for

---

[1] Defendant submitted a statement, pursuant to Local Civil Rule 56.1, which asserts material facts which it claims are undisputed in this case. Defendant also complied with Local Civil Rule 56.2 by providing notice to *pro se* plaintiff that he is not entitled to simply rely on allegations in his complaint, but is required to submit evidence,

summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir. 2001). Unless otherwise indicated, the following facts are undisputed or plaintiff has offered no evidence to controvert such fact.

Plaintiff, an African-American male, was hired as a part-time cleaner by Glen Cove in April of 2002. (Tareke Deposition, February 21, 2007 (hereinafter, "Tareke Dep.") at 35-36.) Plaintiff became a full-time cleaner in May of 2002. (*Id.* at 36.) In his role as a cleaner, plaintiff was responsible for cleaning the main office, the guidance office, two classrooms, the auditorium, and faculty bathrooms. (*Id.* at 39.) In addition, plaintiff was occasionally asked to shovel snow and unload supplies. (*Id.* at 39-40.) By December 2002, plaintiff's direct supervisor was Roy Bencio, who is of Filipino descent.[2] (*Id.* at 43-44.) Plaintiff never filed any complaint with any supervisor or administrator in the Glen Cove School District. (Exh. D, ¶ 11.)[3]

On December 20, 2004, the Board of Education voted to terminate plaintiff effective December 9, 2004 on the ground of insubordination. (Exh. L.) According to defendant, plaintiff's termination was the result of several incidents of insubordination involving plaintiff.

---

including sworn affidavits, witness statements, and documents to respond to the motion for summary judgment, pursuant to Fed. R. Civ. P. 56(e). This action provided actual notice to plaintiff of the consequences of non-compliance with the requirements of Fed. R. Civ. P. 56. *See, e. g., Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56 . . . . [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56. . . . In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). Although the plaintiff did not specifically respond to defendants' Rule 56.1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se*, and considers factual assertions made by his opposition letter with accompanying exhibits as contesting defendant's statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Where possible, the Court has cited to plaintiff's deposition for the undisputed facts, rather than the defendant's Rule 56.1 Statement.

---

[2] Plaintiff testified in his deposition that, during his probationary period as a full-time cleaner in early 2002, his supervisor was Chuck Familetti, but that Bencio became his supervisor by December 2002. (Tareke Dep. at 43-45.) In his interrogatory responses, plaintiff also identified Bencio as his supervisor. (Exh. D, ¶ 7.)

[3] Unless otherwise noted, all references to exhibits are documents that were submitted with the Declaration of Steven C. Stern, Esq., in support of defendant's motion for summary judgment.

2

The evidence related to those incidents of insubordination, some of which is undisputed, is summarized below. Plaintiff also recounted an incident in which a racial epithet was used by a co-worker in a dispute with plaintiff, which is also summarized below.

(1) Evidence of Insubordination in December 2002

In December 2002, plaintiff had a verbal altercation with Bencio. (Tareke Dep. at 51-52.) In particular, Bencio approached plaintiff to advise him that there was some graffiti on the walls in his section of the school. (*Id.*) Plaintiff contends that this conversation occurred before he (plaintiff) was to be on duty, while he was reading the newspaper in the cafeteria. (*Id.*) Plaintiff responded to Bencio by telling him to "get out of [his] f***ing face" and to "stop nagging [him]." (*Id.*)

Also, according to Bencio, on December 19, 2002, Bencio told plaintiff that he had forgotten to turn off the lights in the Guidance area and that they were left on overnight. (Ex. F.) Plaintiff told Bencio to leave him alone, called him "stupid" and used the "F word." (*Id.*)

(2) The Incident Involving "Jimmy"

In June 2003, plaintiff was involved in a dispute with another employee named Jimmy. (Tareke Dep. at 59-68.) Plaintiff alleges that, during a dispute over moving boxes delivered to a computer classroom, Jimmy referred to the plaintiff using the "N word." (*Id.* at 59.) Plaintiff reported this incident to Bencio. (*Id.* at 61-62.) Bencio then reported it to the Grounds and Building Supervisor, Frank Bouza. (*Id.*) The following day, Bouza called a meeting with all of the cleaning staff. (*Id.* at 62-64.) In addition, Joseph Solomito, the union representative, was present at the meeting. (*Id.* at 63-64.) The staff was warned that any similar incidents would lead to the employee's termination. (*Id.* at 64.) Plaintiff stated that he was satisfied with the resolution of the matter and did not wish to pursue additional recourse.[4] (*Id.* at 65.) Plaintiff testified in his deposition that he was not subjected to such slurs before or after this incident.[5] (*Id.* at 68.)

---

[4] Defendant notes that, on June 25, 2003, shortly after the incident with Jimmy, plaintiff requested a five-week leave of absence to visit his family in Ethiopia. (Tareke Dep. at 77-79; Albanese Aff. ¶¶ 4-5.) Plaintiff was only entitled to two weeks vacation pursuant to the collective bargaining agreement, but made the request for special consideration to Deborah L. Albanese, Executive Director of Human Resources, and the Board of Education approved the request for the leave. (Tareke Dep. at 77, 80.) The approval was conveyed to the plaintiff by Albanese and copied to Mr. Bouza. (Exh. E.) Plaintiff took the five weeks of extended leave, consisting of two weeks of paid vacation and three weeks of extended personal leave. (Tareke Dep. at 79.) Plaintiff testified that, when he returned to work, no one assigned him additional work, singled him out for discipline, or made any derogatory comments toward him. (*Id.* at 82.)

[5] Plaintiff also testified in his deposition that he overheard Head Custodian Chuck Familetti use the "N word," although it was never directed at plaintiff. (Tareke Dep. at 75.) Tareke did not provide details as to the dates or circumstances of such alleged references, but stated that it did not offend him and he did not report Mr. Familetti's comments to anyone. (*Id.* at 77.)

3

### (3) Evidence of Plaintiff's Insubordination in September and November 2003

According to Bencio, in September 2003, Bencio asked plaintiff to assist him and plaintiff refused. (Exh. F.) Similarly, according to Bencio, on November 25, 2003, three cleaners were absent from work. (*Id.*) Bencio asked plaintiff to assist with cleaning in certain classrooms and plaintiff refused. (*Id.*) Bencio reported that another such incident occurred on November 26, 2003, when two cleaners were absent from work, and plaintiff refused to assist. (*Id.*) Plaintiff admitted in his deposition that on one day he refused to assist when a co-worker was out sick. (Tareke Dep. at 72.)

### (4) Evidence of Plaintiff's Insubordination Following the December 8, 2004 Basketball Game

On December 8, 2004, there were two basketball games in the school gymnasium. (Tareke Dep. at 112.) It was standard practice, at the conclusion of each game, for the cleaners to assemble in the gymnasium to close the bleachers and clean the facility. (*Id.* at 113.) Plaintiff did not report to the gymnasium after the game. (*Id.* at 113.) Bencio searched the school for plaintiff and located him in a school hallway. (*Id.* at 114.) When Bencio asked plaintiff why he was not in the gym when he was supposed to be, plaintiff responded that he was cleaning his section of the school at that time and did not want to wait in the gym for the game to end. (*Id.*) According to Bencio, plaintiff told Bencio, his supervisor, that he was "acting like a boss" and told Bencio that he (plaintiff) could do anything because Bencio's "daddy is gone," which was an apparent reference to the fact that Bencio's supervisor, Frank Bouza, was not present at the time. (Exh. F.) In his deposition, plaintiff stated that Bencio was yelling at him and that he told Bencio, among other things: (1) "We're both employees, do not talk to me like this" (Tareke Dep. at 116); (2) "Respect me like an employee and I will respect you like a supervisor" (*Id.* at 117); and (3) "Don't treat me like a little baby" (*Id.* at 119). They then proceeded to the gymnasium and, when they arrived, the other five cleaners were already in the gymnasium and waiting for plaintiff. (*Id.* at 117-18.) Plaintiff admitted in his deposition that the work could not start without him: "The bleachers were too heavy. We needed more power to push it." (*Id.* at 118.)

At the end of the night, plaintiff asked Bencio for cleaning supplies for the following day. (*Id.* at 121-122.) Bencio told plaintiff that he would give him the supplies the next day. (*Id.*) Plaintiff then told Bencio that he would file a complaint against him if he did not give him the supplies. (*Id.* at 122-23.)

### (5) Plaintiff's Suspension and Termination

After the December 8, 2004 incident, the Head Custodian, Chuck Familetti, reported the incident to the Central Administration. (Exh. G.) In the report, Familetti stated:

> It has been reported to me (many times before) that Mr. Tareke Adam has refused to do any additional tasks asked of him, even though he had the time to do them. This last incident, however, has prompted me to **officially make a report to you**. Mr. Roy Bencio, the Night Head Custodian, reported to me the latest complaint.

(Exh. G.) Familetti asked that plaintiff be transferred from that building. (*Id.*) The issue was then brought to the attention of Dr. Joseph Vasti, who was the Interim Director of Facilities, and Deborah Albanese. (Albanese Affidavit ¶¶ 6-7; Exhs. H-L.)

On December 9, 2004, plaintiff met with Ms. Albanese, Mr. Familetti, Dr. Vasti and Mr. Solominto at the District Office for the purpose of discussing the alleged insubordination. (Tareke Dep. at 124-25.) The administrators decided to suspend plaintiff for two days while Albanese and Vasti conducted an investigation into the allegations of insubordination. (*Id.* at 124-25; Exhs. H-K.)

Albanese and Vasti interviewed Bencio on December 9, 2004 and Bencio provided them with his notes of the plaintiff's instances of insubordination. (Albanese Aff. ¶ 10; Exhs. F and J.) According to Albanese, Bencio explained the incident after the basketball game and, among other things, stated the following: (1) although plaintiff is a good worker in his section, he refuses to do any work outside his regular section; (2) plaintiff was always asking for help, but was not helping others; (3) plaintiff's attitude was a problem; (4) plaintiff's co-workers, Johnnie Johnson and Thomas Glozek, were witnesses to plaintiff's poor attitude and use of the "F word" to Bencio; (5) a teacher named Kathy Vitale had complained about plaintiff refusing to open a faculty bathroom for her. (Albanese Aff. ¶¶ 11-14; Exh. J.)

On December 10, 2004, Albanese conducted interviews of co-workers Johnson and Glozek. (Albanese Aff. ¶¶ 15-16.) According to Albanese, Johnson, who is African-American, acknowledged that he overheard plaintiff tell Bencio to "f*** himself" and said, "You're not my boss," or words to that effect. (Albanese Aff. ¶ 15; Exh. K.) Johnson also told Albanese that he overheard plaintiff tell Bencio that he was busy on an occasion when Bencio asked him to do something. (*Id.*) According to Albanese, Glozek told Albanese that he had witnessed the incident in which Bencio told plaintiff that plaintiff had left the lights on in his section overnight and, in response, plaintiff got hostile and used the "F word." (*Id.* ¶ 16.) Glozek also stated that plaintiff did not respect Bencio, plaintiff was defiant towards authority, and that he heard plaintiff say to Bencio, "That's not my job." (*Id.*)

Albanese also interviewed Cathy Vitale, who was a teacher at the high school. (Albanese Aff. ¶ 17; Exh. K.) According to Albanese, Vitale had asked plaintiff to either open the faculty bathroom or leave it unlocked and plaintiff refused, stating that the kids would mess it up. (*Id.*)

After the conclusion of the investigation, the administration determined that plaintiff should be terminated based on the information revealed during the investigation, including the documentary information of instances of plaintiff's insubordination, and the anecdotal evidence from the interviews of several witnesses. (Albanese Aff. ¶ 18.) On December 20, 2004, the Board of Education voted to terminate plaintiff effective December 9, 2004. (Exh. L.) By letter dated December 21, 2004, plaintiff was informed of the Board's decision. (*Id.*)

B. Procedural History

As a result of his termination from Glen Cove, plaintiff filed a formal administrative

5

complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race. The EEOC subsequently issued a right-to-sue letter, which authorized plaintiff to file the instant lawsuit, alleging, *inter alia*, a violation of Title VII.

On March 17, 2006, plaintiff filed the instant lawsuit. On June 25, 2007, after the completion of discovery, defendant filed a motion for summary judgment. By letter dated June 27, 2007, plaintiff urged the Court to deny defendant's motion as untimely, to which defendant responded on July 3, 2007.[6] On July 25, 2007, plaintiff filed a two-page letter in opposition to the motion, which attached copies of performance evaluations. Defendant filed a reply on July 27, 2007. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a

---

[6] Although plaintiff argues in his opposition that defendant's motion should be rejected as untimely, plaintiff's contention that the motion papers were untimely is factually incorrect. The deadline to submit the motion was June 25, 2007. The motion was filed via ECF on that date and served by mail on plaintiff. Thus, the motion was filed and served in a timely fashion.

6

party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, *Ltd. Pshp.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

#### A. Race Discrimination Claim

Plaintiff claims that defendant discriminated against him on the basis of race. Specifically, he claims that this unlawful discrimination was the motivating force behind his termination.

Because plaintiff presents no direct evidence of discriminatory treatment based on his race, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of racial discrimination under Title VII, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis.*" *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221(quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. New York Racing Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *see also Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).[7]

Defendant argues that plaintiff cannot establish a *prima facie* case because he cannot demonstrate that he was terminated under circumstances giving rise to an inference of discrimination. However, for the purposes of this motion, the Court assumes that plaintiff has satisfied the minimal burden required by *McDonnell Douglas* to make out a *prima facie* case. Here, the defendant has offered a legitimate, non-discriminatory reason for plaintiff's discharge–namely, insubordination. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race discrimination by examining each parties' evidence individually and then proceeding to evaluate the evidence as a whole. *See Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515.

In the instant case, the Court finds that summary judgment is warranted because the record contains no evidence from which a reasonable jury could infer that plaintiff was terminated under circumstances giving rise to racial discrimination. Plaintiff merely offers vague and at most conclusory allegations of discrimination, which are insufficient to allow a Title VII case to survive summary judgment and proceed to trial. *See Forsyth v. Fed'n Employment and Guidance Serv.,* 409 F.3d 565, 573-74 (2d Cir. 2005); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than

---

[7] As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove–particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

conclusory allegations of discrimination to defeat a motion for summary judgment."); *see also Turner v. Davidson/Gilmour Pipe Supply*, No. 04-CV-3278 (ARR), 2006 WL 1652613, at *9 (E.D.N.Y. June 14, 2006) (concluding that plaintiff's conclusory allegations of discrimination were insufficient to sustain a Title VII claim).

Plaintiff provides little detail and only two examples as to the interaction of race and his employment. Specifically, in his deposition, plaintiff referred to two instances where racial epithets were used. In the first instance, plaintiff stated that he overheard Frank Familetti, the Head Custodian, use the "N word," although plaintiff stated that Mr. Familetti did not use the term toward plaintiff. (Tareke Dep. at 75-76.) Plaintiff was unable to provide the specific time frame or circumstances of the alleged use of the "N word" by Familetti in a conversation with others. In the second instance, Jimmy, a co-worker, used the "N word" in reference to plaintiff. Plaintiff stated that this was the only incident during his employment in which a racial slur was directed at him. (Tareke Dep. at 68.) Plaintiff's supervisor, Bencio, reported the incident to the Grounds and Building Supervisor, who called a meeting with all cleaners and warned that any other such incidents would result in termination. (*Id.* at 62-64.) Plaintiff stated he was satisfied with the resolution of the matter. (*Id.* at 65.)

Verbal comments may constitute direct evidence of discrimination when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action. *See, e.g., Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (finding discriminatory motive where comments were made to plaintiff "on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process"); *Howe v. Town of Hempstead*, No. 04 Civ. 0656 (DRH), 2006 U.S. Dist. LEXIS 78927, at *22 (E.D.N.Y. Oct. 30, 2006) ("[Discriminatory] comments may constitute evidence of an intent to discriminate, but only if a sufficient nexus exists between the comments and the adverse employment action.") (citing *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) ("Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.")). However, such comments must be distinguished from mere stray remarks because, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence [to support] a case of employment discrimination." *Danzer v. Norden Sys.,* 151 F.3d 50, 56 (2d Cir. 1998). The court must evaluate discriminatory comments in light of all of the evidence presented of discriminatory motive. While "[stray remarks], without more, cannot get a discrimination suit to a jury. . . . [w]hen, however. . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." [8] *Danzer*, 151

---

[8] "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,' a court should consider the following factors: (1) who made the remark, *i.e.,* a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,*

9

F.3d at 56; *accord Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 458 (2d Cir. 2001).

In the instant case, the alleged isolated remarks by Jimmy and Familetti when considered in the context of all the evidence, are too "remote and oblique. . . . in relation to the employer's adverse action" to permit a reasonable jury to find for plaintiff. *Tomassi v. Insignia Fin. Group.*, 478 F.3d 111, 115 (2d Cir. 2007). First, the remark by Jimmy occurred over one year prior to the defendant's termination. A remark made so distant in time from the allegedly discriminatory behavior does not tend to support plaintiff's claim that her discharge was the product of discrimination. *See, e.g., Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001); *Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 536 (E.D.N.Y. 2006) (finding no connection where three months elapsed between alleged discriminatory statements and termination); *Argueta v. North Shore Long Island Jewish Health System, Inc.,* No. 01 CV 4031 (JG), 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) ("Though it is unclear when some of the remarks were made, the Miami remark was made in August 1999. . . . more than five months before the February 10, 2000 decision to fire [plaintiff]. [Plaintiff] cannot defeat summary judgment based on these stray remarks, as she has failed to establish a nexus between them and North Shore's decision to fire her.") (citation omitted); *Emanuel v. Oliver, Wyman & Co., LLC*, 85 F. Supp. 2d 321, 335 (S.D.N.Y. 2000) ("months"-long gap).

whether it was related to the decision-making process." *Pronin v. Raffi Custom Photo Lab, Inc.,* 383 F. Supp. 2d 628, 637 (S.D.N.Y. 2005) (collecting cases).

Moreover, Jimmy was a co-worker, not a supervisor, and there is no evidence whatsoever that Jimmy had any involvement in any decision-making related to plaintiff or anyone else. Similarly, although Familetti was the Head Custodian, there is no evidence that Familetti was involved in the decision to terminate plaintiff.[9] In fact, it is undisputed that the termination decision was made by School Administrators at Central Administration and the Board of Education. In short, there is not a scintilla of evidence that the decisionmakers who were involved in the decision to terminate the plaintiff, much less the Board of Education which voted to terminate plaintiff, had any knowledge of these incidents or were motivated in any way by plaintiff's race. Under such circumstances, the stray remarks by these non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination. *See, e.g., Beshty v. GM,* 327 F. Supp. 2d 208, 213 (W.D.N.Y. 2004) ("[Employee's] alleged remark was made by someone who had no involvement in plaintiff's termination, months before the

---

[9] Although Familetti relayed Bencio's complaints concerning the December 2004 incident between plaintiff and Bencio and asked that plaintiff be transferred from the building, there is no indication that Familetti had any role in the investigation and/or the termination decision. Instead, Familetti reported the information to Central Administration and the Executive Director of Human Resources and the Interim Director of Facilities interviewed Bencio directly, as well as other employees who corroborated the acts of insubordination by plaintiff. In any event, even assuming *arguendo* that Familetti could be considered a decisonmaker in the chain of command, plaintiff's vague references to alleged comments by Familetti would be insufficient to raise an inference of discrimination regarding the termination decision in light of the entire record.

termination occurred. That is not enough to give rise to a genuine issue of material fact."); *Venti v. EDS,* 236 F. Supp. 2d 264, 277 (W.D.N.Y. 2002) (holding that coworker's statement that plaintiff was "too old" to be pregnant did not support inference of discrimination because it was not connected to employer's decision to terminate and speaker had no input regarding termination decision); *Silverman v. City of New York,* 216 F. Supp. 2d 108, 117-18 (E.D.N.Y. 2002) (holding that for purposes of *prima facie* analysis, religious bias of certain co-workers could not be imputed to individuals responsible for plaintiff's suspension); *Douglas v. Dist. Council 37 Mun. Emples. Educ. Fund Trust*, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002) (holding that, ambiguous and abstract comments by non-decisionmakers were insufficient to raise inference of discrimination); *Georgy v. O'Neill,* No. 00 Civ. 0660, 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (holding that alleged reference to national origin by non-decisionmaker six months prior to plaintiff's termination was "the kind of isolated stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment"); *Kotlowski v. Eastman Kodak Co.*, 922 F. Supp. 790, 801 (W.D.N.Y. 1996) (holding that stray comments by co-workers without supervisory control over plaintiff cannot rebut defendant's nondiscriminatory reason for termination); *Corcoran v. Gab Bus. Services, Inc.,* 723 F. Supp. 966, 968-69 (S.D.N.Y. 1989) (holding plaintiff failed to meet *de minimis* burden where he introduced only two isolated comments made by individuals who had no involvement in his termination).

Thus, although the Court recognizes that these alleged isolated remarks are highly offensive, the remarks, viewed in the context of the case as a whole (including the overwhelming evidence that defendant had legitimate, non-discriminatory reasons to discharge plaintiff discussed *infra*), do not support a reasonable inference that plaintiff's discharge was the product of discrimination. *See, e.g., Tomassi*, 478 F.3d at 115 ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (acknowledging the probative value of a supervisor's allegedly discriminatory remark at the *prima facie* stage but finding that, when the remark is "considered in the context of the case as a whole. . . . [it] does not in the end carry the burden [the plaintiff] bears of showing he was treated adversely for discriminatory reasons"); *Danzer*, 151 F.3d at 56 ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination.").

The absence of any evidence from which a reasonable jury could conclude that the termination decision was a pretext for discrimination is reflected in plaintiff's deposition and discovery responses. In his deposition, plaintiff was unable to articulate any proof to support a conclusion that his termination was based on race. Instead, it appears that he simply believes that he was not given an adequate explanation for his termination. (Tareke Dep. at 140.) In fact, the lack of such evidence also is exemplified in plaintiff's response to defendant's interrogatories:

> 13. State the reason(s) for which you believe your employment was terminated.

> A. I have no idea. Still waiting for an explanation.
>
> 14. Identify all witnesses with knowledge or information to support your claim that your termination had anything to do with your race.
>
> A. I did not make that claim.

(Exh. D.) Thus, it is clear from a review of plaintiff's deposition and his two-page opposition that he has no evidence of racial discrimination in the termination decision, but has brought this lawsuit simply because he disagrees with the employment decision. Such disagreement, with no evidence of discrimination, is insufficient to defeat a summary judgment motion. As one court has noted, "[t]he mere fact that an employee disagrees with her employer's assessments of her work. . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks v. Conde Nast Publs.,* 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000); *see McLee*, 109 F.3d at 135 (finding summary judgment appropriate on Section 1981 and Title VII discriminatory discharge claims where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried"); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . . were false or a pretext for discrimination."); *see also D'Cunha v. N.Y. Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445 (DLI), 2006 WL 544470, at *6 (E.D.N.Y. March 6, 2006). Instead, "[plaintiff's] fundamental disagreement with the conclusions her supervisors drew from incidents which she admits occurred, and her subjective belief that they should not have reflected badly on her performance . . . , is not evidence that her supervisors' appraisals were a sham, invented to mask discrimination." *See Taylor v. Polygram Rec.*, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999).

In any event, notwithstanding plaintiff's attempts to challenge the articulated non-discriminatory reason for his termination by arguing that defendant failed to provide an adequate explanation for his termination, the defendant has offered compelling, often undisputed, evidence of plaintiff's insubordination. In other words, although plaintiff disputes certain incidents or certain statements attributed to him, he admitted in his deposition to various acts of insubordination, including: (1) plaintiff admitted that he told his supervisor, Mr. Bencio, to "get out of [his] f***king face" and "stop nagging." (Tareke Dep. at 51-52); (2) plaintiff admitted that he refused to assist in certain tasks when asked by his supervisors (Tareke Dep. at 72, 94-95); and (3) plaintiff acknowledged that, in connection with the December 8, 2004 incident, he was not in the gymnasium to clean up after the basketball game as required and had a confrontation with Mr. Bencio regarding that job. (Tareke Dep. at 116-22.) These undisputed instances provide compelling support for the termination decision and plaintiff's denial with respect to the other instances, in the complete absence of evidence that the decisionmakers were motivated by race, is insufficient to survive summary

judgment.¹⁰ Thus, summary judgment is appropriate here because the defendant has offered a legitimate, non-discriminatory reason for plaintiff's discharge – namely, the charges of insubordination – and plaintiff's vague and conclusory allegations of discrimination are not sufficient to allow a finder of fact to conclude that the explanation was merely a pretext for discrimination. *See Maqsood v. Bell Sec., Inc.*, No. 03-CV-8717 (RSW), 2006 WL 1380259, at *5 (S.D.N.Y. May 22, 2006) ("[W]here, as here, [plaintiff's] claim is based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct, summary judgment is appropriate.") (internal citations, quotations, and alterations omitted); *Singleton v. Fed. Bureau of Prisons*, No. 04-CV-1526 (CPS), 2006 WL 1329712, at *4 (E.D.N.Y. May 16, 2006) ("[M]ere conclusory allegations of discrimination by plaintiff will not prevail when defendant has provided convincing evidence to explain its conduct.") (citing *Stern*, 131 F.3d at 312).

In sum, plaintiff has failed to produce any evidence that would allow a reasonable jury to draw an inference of racial discrimination in the termination decision. Plaintiff solely makes vague and at best conclusory allegations that the alleged adverse employment action was impermissibly based on race, which are plainly insufficient to allow plaintiff's claim to survive the instant motion for summary judgment.

B. Hostile Work Environment

Plaintiff does not allege a claim for hostile work environment but, even if he did intend to bring such a claim, it also cannot survive summary judgment for the reasons discussed below.

---

¹⁰ In his two-page opposition to the summary judgment motion, the only evidence to which plaintiff points to rebut defendant's articulated non-discriminatory reason for termination are his yearly evaluations from 2002-2004. In particular, plaintiff argues that there is no indication of insubordination on these evaluations. As a threshold matter, because these evaluations pre-date the December 2004 incident and the investigation that followed in which prior instances of insubordination were uncovered (which formed the basis of his termination), they do not rebut the defendant's basis for termination. Moreover, the 2002 evaluation stated that his "Relationship with Others" needed improvement and his 2004 evaluation stated that his "Attendance/Punctuality" was unsatisfactory and that he needed improvement in other areas. In any event, even assuming *arguendo* that these could be classified as positive evaluations, they do not create a genuine issue of fact as to whether discrimination was the actual motive behind plaintiff's discharge, and utterly fail to address the December 2004 incident and subsequent investigation regarding plaintiff's insubordination. *See, e.g., Brown*, 194 F. Supp. 2d at 192 ("Plaintiff also points to the good evaluations that she had received, but that evidence does not tend to show that her discharge was the product of discrimination."); *Brinson v. New York City Transit Auth.*, 60 F. Supp. 2d 23, 29 (E.D.N.Y. 1999) (finding that evidence of prior good evaluations "fail[s] to dispute the existence of plaintiff's extensive record of warnings, reprimands and suspensions so as to create a genuine issue of fact regarding her job performance"); *Taylor*, 1999 WL 124456, at *14 ("The fact that [plaintiff] may have received prior positive evaluations cannot in itself demonstrate that her later negative evaluations, and the concomitant proffered explanation, are unworthy of credence."); *see also Del Franco*, 429 F. Supp. 2d at 539 ("While plaintiff may have had other positive qualifications for her job, it does not prove that defendant's stated reason was pretextual.") (citation omitted).

13

A hostile work environment, in violation of Title VII, is established by a plaintiff showing that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult. . . . that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993)), *abrogated on other grounds by Burlington Indus., v. Ellerth*, 524 U.S. 742, 753 (1998); *see Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004); *see also Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir. 1999), *abrogated on other grounds Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz*, 202 F.3d at 570.

As a matter of law, plaintiff has failed to present evidence that would allow a reasonable jury to conclude that his workplace was "permeated" with discriminatory intimidation that altered the conditions of his employment. *Howley*, 217 F.3d at 153. The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to state a claim. *See Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23). The Court concludes, as a matter of law, that the alleged discriminatory conduct by defendant fails to rise to the severe level required to support a claim of hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . . offhand comments, and isolated incidents (unless extremely serious)" are not discriminatory changes in the "terms and conditions of employment"); *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (holding that to meet his burden, the plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice); *Knight v. City of New York*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 217-18 (E.D.N.Y. 2001) (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); *Francis v. Chem. Banking Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents).

Based on the complaint, plaintiff's deposition, and his opposition to the motion, it appears plaintiff could attempt to argue, at most, that the allegedly discriminatory remarks – namely, use of the "N word" by a co-worker on one occasion and use of the "N word" by the Head Custodian that was not directed at plaintiff – constituted a hostile work environment. However, viewing the evidence in the light most favorable to plaintiff, the Court finds that these examples are at best "episodic," and are not "sufficiently continuous and concerted in order to be deemed pervasive" and, therefore, any hostile work environment claim brought by plaintiff would fail to survive summary judgment. *See Perry v. Ethan Allen,*

*Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)); *see, e.g., Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (noting that "[i]solated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild. . . . to create an abusive working environment"); *Trinidad v. N.Y. City Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a bitch and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Augustin v. Yale Club of N.Y.C.*, No. 03 Civ. 1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding that "four or five" comments over a five-year period insufficient to support a hostile work environment claim); *Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497 (JBW), 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding two "alleged isolated remarks" by plaintiff's supervisor insufficiently "frequent and pervasive"); *Pagan v. N.Y.S. Div. of Parole*, No. 98 Civ. 5840 (FM), 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that two racially derogatory remarks by supervisor directly to plaintiff did "not amount to the sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII") (citations omitted); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (finding single remark by supervisor insufficient); *Upshur v. Dam*, No. 00 Civ. 2061 (DC), 2003 WL 135819, at *7-*8 (S.D.N.Y. Jan. 17, 2003) (finding one week of "patronizing and racist comments" by supervisor insufficient); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (finding that supervisor's use of racially derogatory slur to refer to defendant on four or more occasions does not alter conditions of employment significantly enough to implicate Title VII).[11]

---

[11] Similarly, plaintiff did not assert a retaliation claim in this complaint. However, even if he did make such an allegation based on the incident involving Jimmy, there is no evidence that the defendant took any adverse action against plaintiff following the incident. In fact, plaintiff never complained about the incident involving Jimmy; rather, plaintiff testified that Bencio reported the incident to Bencio's supervisor. (Tareke Dep. at 87.) The allegation in the complaint, regarding plaintiff being asked to clean two additional bathrooms in September 2004, occurred more than one year after the incident involving Jimmy and there is no evidence that the two incidents are, in any way, related. To establish a *prima facie* case of retaliation, plaintiff must show that (1) he was engaged in protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Terry*, 336 F.3d at 141. Although the burden that a plaintiff must meet at the *prima facie* stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir 1995). Moreover, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a sufficiently distant time after the protected activity; or (2) if there was an "intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998), *abrogated in part on other grounds by Morgan*, 536 U.S. 101 (2002). Here,

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in its entirety and the complaint is dismissed. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 21, 2008
Central Islip, New York

\* \* \*

The plaintiff appeared *pro se* in this action. The attorneys for the defendants are Steven C. Stern and Charles A. Martin, of Miranda, Sokoloff, Sambursky, Slone and Verveniotis LLP, 240 Mineola Boulevard, Mineola, New York 11501.

---

there is simply no evidence from which a reasonable jury could infer that any adverse action taken by defendant was the product of retaliatory motive from the reporting of this incident with Jimmy, which occurred over one year prior to the termination.